David Timmons v. SSA                    CV-98-566      08/17/99

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

David L. Timmons Sr.

   v.                                        Civil No. 98-566-B

**Kenneth S. Apfel, Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**

David L. Timmons Sr. applied for Title II Social Security
Disability Income ("SSDI") benefits on July 9, 1996, alleging
disability since December 31, 1992, due to diabetes, heart
problems and fatigue. He has not engaged in substantial gainful
activity, as defined by Social Security Administration ("SSA")
regulations, since December 31, 1992. After the SSA denied
Timmons' application, he requested a hearing before an
Administrative Law Judge ("ALJ"). ALJ Thomas H. Fallon held a
hearing on Timmons' claim on August 7, 1997, and issued a
decision denying his application on November 13, 1997. The
Appeals Council subsequently denied Timmons' request for review,
making the ALJ's decision the final decision of the Commissioner
of the Social Security Administration ("Commissioner").

Timmons brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g) (West Supp. 1998) ("the Act"), seeking review of the SSA's decision denying his claim for benefits. For the reasons set forth below, I reverse the ALJ's decision and remand for further proceedings.

## FACTS[1]

Timmons alleges an inability to work since December 31, 1992. He was 54 years old at that time. He was insured for disability insurance purposes until December 31, 1995. In order to succeed in his claim for benefits, therefore, Timmons must establish that he was disabled on or before that date.

Timmons attended school through the eighth grade, and only part of the ninth grade. At the age of 17, he left school to work as a logger with his father. In 1973, Timmons took a job with Pepsi-Cola. He was a vending machine service and repair manager for Pepsi-Cola until 1986, supervising a staff of four, moving, repairing and hooking up equipment. Timmons quit his job at Pepsi after 16 years, when he was forced to train his replacement, one of his employer's young relatives. See Record

_____

[1] Unless otherwise noted, the following facts are taken from the Joint Statement of Material Facts submitted by the parties.

at 304.

Timmons then worked as a snack bar manager at Okemo Mountain until 1990. He worked from 1990-92 as a janitor for Clean Care, a Hillsboro-based cleaning company which sent him to work exclusively at the Sylvania plant in that town. From 1992 until 1996, Timmons was self-employed and performed odd jobs.[2]

Timmons has not worked at a substantial gainful activity level, as defined by Social Security regulations, since December 31, 1992.

## A. Medical History Prior to December 31, 1995

Dr. James Ballou, a family practitioner, has treated Timmons since at least the 1980s. Timmons saw Dr. Ballou for a variety of ailments, including acute asthmatic bronchitis, chest congestion, and diabetes. Dr. Ballou also prescribed Prozac for Timmons in 1989 to combat depression. See R. at 203.

Beginning in 1981, Timmons visited Dr. Ballou every few months complaining of chest congestion and difficulty breathing.

---

[2] Timmons claims that his earnings record does not reflect additional income and Social Security taxes paid which, if credited, could extend his insurance coverage beyond December 31, 1995. After the hearing before the ALJ, Timmons submitted incomplete and unsigned copies of IRS tax forms to support his claim. The ALJ stated that the evidence was insufficient. See Record at 314. I find no error in the ALJ's decision on this point.

Dr. Ballou treated Timmons for asthma and acute asthmatic bronchitis. He prescribed Marax, which Timmons took until at least 1992 and again in 1994.

Dr. Ballou referred Timmons to Dr. Donald Wilson for surgery to remove nasal polyps in 1985. See R. at 216. Dr. Wilson wrote that Timmons suffered from "significant allergic rhinitis, nasal polyposis and chronic sinusitis," adding that "I am sure that it is aggravating his asthmatic bronchitis as well." Id.

In 1985, Timmons weighed 255 pounds, standing 5-feet, 7-inches tall. In 1989, Dr. Ballou diagnosed Timmons with diabetes. Dr. Ballou prescribed Glucotrol and referred Timmons to a nurse for a diet consultation. The nurse's records indicate that Timmons suffered from diabetes mellitus, hypertriglycer-idemia, and hypercholesterolemia. She instructed him to lose weight and placed him on a diabetic diet.

In May 1990, Dr. Ballou ordered an intravenous urogram after Timmons complained of pain and bleeding consistent with passing a kidney stone. See R. at 204, 224. The radiology report showed that Timmons had lumbar scoliosis and bone spurs on vertebral bodies of several levels. It also showed prostatic calcification which suggested cystitis.

In 1994, Dr. Ballou found blood, protein and sugar in Timmons' urine. Timmons was treated in the Emergency Care Center of Cheshire Medical Center in January 1994, again complaining of pain while voiding and blood in his urine. He was treated for a urinary tract infection and hemorrhagic cystitis. The following month an intravenous urogram showed prostatic calcifications, with little change since the 1990 test. The report also noted early arterial calcification in the pelvis and degenerative changes in the spine, which also appeared unchanged since 1990.

Timmons saw Dr. Ballou 11 times in 1995. Dr. Ballou's records indicate that these appointments addressed control of Timmons' diabetes, his breathing problems, and his high blood pressure.

At the hearing before the ALJ, Timmons testified that his back problems had existed for "three-quarters" of his life. R. at 32. The problems included trouble with his sciatic nerve, causing constant pain down his leg. See id. Timmons visited at least two chiropractors, Dr. Northrup and Dr. Larson. See R. at 51-2.

Timmons' wife testified that, prior to 1995, Timmons suffered from back and knee pain which would keep him awake at night. See id. at 47. Mrs. Timmons told the ALJ that a doctor

-5-

in Brattleboro gave Timmons a back brace, which he would wear for seven to eight days at a time.  See id.  She also noted that he had X-rays taken by Dr. Albert Johnson at his office in Keene, and that Dr. Johnson and Dr. Northrup had both suggested surgery.  See id. at 57-8.  Timmons testified that he refused to have back surgery because he had "heard stories that are not really good."  Id. at 45.

Medical records to support the couple's testimony on these points were not submitted to the ALJ, apparently because the doctors were no longer practicing.  Dr. Johnson had passed away after moving to Hawaii.  See id.  at 58-9.  Also, the Timmons family home burned down in 1993, destroying his employment records and, presumably, any medical records stored there.  See id. at 34.

## B.   Medical History After December 31, 1995

In April 1996, Dr. Ballou wrote that Timmons likely had coronary artery disease, noting that a cardiogram showed a possible old arterial septal myocardial infarction.  Timmons complained of headaches, fatigue and chest pain.  Dr. Ballou prescribed Toprol, ordered blood tests and scheduled a stress test.

Dr. Frederick Wiese oversaw Timmons' stress test in May 1996. He noted that dyspnea[3] limited Timmons' test, and that Timmons had both resting hypertension and an abnormal resting EKG. While Timmons' heart rate responded normally to graded activity, Dr. Wiese stated that Timmons probably needed anti-hypertensive therapy. He also noted that Timmons could have coronary disease and endothelial dysfunction.

Timmons visited chiropractor Jeb Thurmond in July 1996, complaining of severe chronic pain in his knees and lumbosacral spine area. Dr. Thurmond noted that walking, twisting and bending exacerbated Timmons' pain, and stated that Timmons probably could not work for more than an hour without suffering severe hip and leg pain. Dr. Thurmond's notes indicate that Timmons suffered from severe cervical and lumbar spine spondylosis and degenerative disc disease.

A lumbar spine X-ray taken of Timmons in August 1996 showed asymmetric transitional vertebrae with psuedoarthrosis, thoracolumbar scoliosis, moderately extensive degenerative changes, and vascular calcifications. Bony structures and

---

[3] Dyspnea is "shortness of breath, a subjective difficulty or distress in breathing usually associated with disease of the heart or lungs." Stedman's Medical Dictionary 535 (26th ed. 1995).

vertebral bodies were normal, but there was a partial loss of disc space, as well as proliferative changes in the mid-lumbar spine. A chest X-ray taken at the same time showed no active disease.

Timmons was admitted to the Cheshire Medical Center in March 1997, suffering from acute inferior wall myocardial infarction. The treating cardiologist, Dr. Craig Brett, noted that Timmons' abnormal baseline EKG suggested that he had suffered a prior infarction.[4] Dr. Brett wrote that Timmons suffered chest pain daily, which was typically related to anxiety but sometimes related to exertion. Upon discharge, Dr. Brett suggested that Timmons increase his Prozac and seek counseling at Monadnock Family Service.

Timmons continued to see Dr. Brett throughout the spring of

---

[4] In his decision, the ALJ stated that Timmons' testimony was not credible, noting that "The claimant testified to having six heart attacks prior to December, 1995. The claimant was not diagnosed with cardiac problems until 1996." R. at 21. The ALJ either misunderstood or mischaracterized Timmons' testimony on this point. Timmons' testimony reflects that Dr. Ballou conducted a cardiogram, and "He was excited as hell. He said you had about six heart attacks." R. at 42. Timmons went on to testify that after a subsequent stress test he was told that he "may have had a mild heart attack but nothing that shows up real serious on the . . . record." Id. at 43. Moreover, letters from Dr. Ballou and Dr. Brett indicate that, although Timmons' heart disease was not diagnosed until 1996, he likely suffered from poor cardiac health prior to that date. See id. at 300-01.

1997. He developed flu symptoms, a dry cough, a lower respiratory tract infection, and dyspnea. Dr. Brett prescribed antibiotics and gave Timmons an inhaler. Fearing that Timmons' chronic lung disease was worse than he initially thought, Dr. Brett referred Timmons to Dr. Jeffrey Newcomer for a pulmonary consultation.

Dr. Newcomer diagnosed Timmons with severe chronic lung disease with restriction in lung capacity which, when combined with his obesity and cardiac disease, caused profound dyspnea.

Timmons saw Dr. Brett again in June 1997, complaining that he "feels down in the dumps" due to his financial hardships, caring for his family, and his poor health. Dr. Brett noted that Timmons' hypertension had worsened, possibly because of weight gain. Timmons' condition was suggestive of congestive heart failure or post-infarct ischemia, although X-rays showed no active disease in his chest.

Dr. Newcomer completed a functional capacity assessment of Timmons in July 1997, stating that Timmons was certainly limited by his severe lung disease. He advised Timmons to avoid any work which would expose him to inhaled irritants.

**C.    Evidence Submitted to the ALJ After the Hearing**

Timmons' attorney submitted additional documents to the ALJ on September 4, 1997.  The medical records included: (1) a 1997 letter from Dr. Ballou summarizing his treatment of Timmons between 1992 and 1995; (2) a 1997 letter from Dr. Brett noting that Timmons' health problems were "almost certainly present" in 1995; and (3) a report of a 1997 psychological evaluation conducted by Dr. Tracey Alysson which details Timmons' "long-standing and often lifelong nature of severe difficulties" resulting in "depression, anxiety, physical distress, and alienation."  R. at 300-08.

The new evidence was retrospective in nature and did attempt to address the period of time prior to Timmons' last date of insured status.  Dr. Ballou's letter, in particular, noted that Timmons' health was poor throughout the 1990s:

> [Timmons was] an obese gentleman with intermittent hypertension, poorly controlled diabetes, poorly controlled weight, chronic lung disease, resulting in the coronary event of 1997.

R. at 300.  Dr. Brett wrote that, although he did not treat Timmons prior to 1997, the current severity of his health problems made it reasonable to infer that "his underlying emphysema and coronary artery disease were likely present for some years previously."  R. at 301.  Dr. Alysson opined that

Timmons suffered from depression and anxiety well before 1995, noting that he reported sleep difficulties, headaches, and feelings of isolation going back 20 years. <u>See</u> R. at 305-06.

On November 13, 1997, the ALJ issued his decision denying Timmons' claim, noting that the record remained open for more than a month after the hearing, but that "no additional evidence has been received." R. at 20. Timmons' attorney wrote to the ALJ, asking him to withdraw his decision and issue a new one based on the obvious error regarding the lack of additional evidence. <u>See</u> R. at 309. ALJ Fallon responded in a letter to Timmons, stating that the additional evidence did not change his analysis or the outcome of Timmons' claim:

> I find no major errors in my decision. The new evidence submitted referred to a time period after your date last insured and was not material to the period in question.

R. at 314. After unsuccessfully seeking review before the Appeals Council, Timmons brought this action.

**STANDARD**

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative

record; and (2) enter a judgment affirming, modifying, or reversing the Commissioner's decision. See 42 U.S.C.A. § 405(g) (West Supp. 1998). My review is limited in scope, however, as the Commissioner's factual findings are conclusive if they are supported by substantial evidence. See Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); 42 U.S.C.A. § 405(g). The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner has misapplied the law or has failed to provide a fair hearing, however, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health and Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The [Commissioner's] conclusions of

-12-

law are reviewable by this court.")  I apply these standards in reviewing the issues Timmons raises on appeal.

## DISCUSSION

An ALJ is required to apply a five-step sequential analysis to determine whether a claimant is disabled within the meaning of the Act.[5]  At step two, the claimant has the burden of establishing that he suffers from a medically severe impairment which significantly limits his physical or mental ability to perform basic work activities.  See 20 C.F.R. § 404.1520. Although the burden lies with the claimant, he need only make a de minimis showing to surpass a denial of benefits at step two. See McDonald v. Secretary of Health and Human Services, 795 F.2d 1118, 1125 (1st Cir. 1986); Social Security Ruling 85-28, 1985 WL

---

[5]  The ALJ is required to consider the following five steps when determining if a claimant is disabled:
(1) whether the claimant is engaged in substantial gainful employment;
(2) whether the claimant has a severe impairment that lasted for twelve months or had a severe impairment for a period of twelve months in the past;
(3) whether the impairment meets or equals a listed impairment;
(4) whether the impairment prevents or prevented the claimant from performing past relevant work;
(5) whether the impairment prevents or prevented the claimant from doing any other work.
See 20 C.F.R. § 404.1520.

56856 SSA. The step-two requirement is merely a threshold, "designed to do no more than screen out groundless claims." McDonald, 795 F.2d at 1124. Thus, an ALJ may deny a claim for benefits at step two:

> only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.

SSR 85-28, 1985 WL 56856 at *3; see also McDonald, 795 F.2d at 1124.

Here, Timmons argues that the ALJ erred at step two by applying a heightened standard to deny his claim for benefits. I agree.

Although the ALJ's decision does not explicitly set forth a heightened standard, his statements at the hearing evidence his misapprehension of the proper step-two analysis:

> ATTY: . . . I realize that your concern about the severity – it's our position that the combination of these problems . . . clearly there's a back problem, there's a breathing problem that you have to look at the multiple impairments in combinations and the, the severity – is just the threshold requirement that –– to screen out groundless claims.

> ALJ: It's not really a threshold requirement.

> ATTY: Well, that's what I understand it –

-14-

> ALJ: It is a requirement.  I don't know where you got
> that understanding.  It's part of the sequential
> evaluation process.
>
> ATTY: Yes, it is.
>
> ALJ: It's not a threshold.

R. at 49-50.  The ALJ is clearly wrong.  In upholding the validity of step two, the Supreme Court stated that:

> [B]oth the language of the Act and its legislative history support the Secretary's decision to require disability claimants to make a <u>threshold</u> showing that their 'medically determinable' impairments are severe enough to satisfy the regulatory standards.

<u>Bowen v. Yuckert</u>, 482 U.S. 137, 145 (1987)(emphasis added); <u>see also</u> <u>McDonald</u>, 795 F.2d at 1123 ("the Secretary is not precluded from implementing a <u>threshold</u> test of medical severity to screen out groundless claims")(emphasis added).

Moreover, it is apparent from both the record and the ALJ's decision that he required more than a "de minimis" showing by Timmons to surpass step two.  The ALJ wrote that, although Timmons clearly suffered from multiple impairments as of the hearing, "there is no evidence of any ongoing treatment or limitations prior to December 31, 1995, the date he was last insured.  There is no longitudinal record which support severity of these conditions."

The medical evidence before the ALJ did not establish that Timmons' condition was <u>disabling</u> as of December 31, 1995. Indeed, the medical evidence regarding Timmons' condition prior to that date is inconclusive at best, which is precisely why the ALJ should have proceeded to the next step in the sequential analysis. Where the evidence clearly shows that a claimant's impairments have no more than a minimal effect on his ability to work, the ALJ may deny a claim at step two. <u>See</u> SSR 85-28, 1985 WL 56856 at *3. Where, as here, the medical evidence is inconclusive, the ALJ must continue to adjudicate the claim.[6] <u>See</u> <u>id.</u> As such, I must reverse his decision and remand the case for further consideration at step two of the sequential analysis.[7]

_____

[6] I state no opinion here as to whether, ultimately, Timmons provided substantial evidence to establish his disability as of December 31, 1995. I speak only to the ALJ's error in holding Timmons to more than a de minimis showing at step two.

[7] Although the issue was not briefed by the parties, I am compelled to address the possible relevance of Social Security Ruling 83-20, which sets forth the Secretary's policy on determining the onset date of disability. The Ruling states:
    With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the

## CONCLUSION

Pursuant to sentence four of 42 U.S.C.A. § 405(g), I reverse the decision of the ALJ and remand the case for further proceedings at step two of the five-step sequential analysis, consistent with the Secretary's standards as interpreted by the First Circuit and discussed in this Order.  Plaintiff's motion for an order reversing the decision of the commissioner (document no. 6) is therefore granted, and the Defendant's motion for an order affirming the decision of the commissioner (document no. 8) is denied.

---

> medical and other evidence that describe the history and symptomatology of the disease process. . . . How long the disease may be determined to have existed at the disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the . . . ALJ should call on the services of a medical advisor when onset must be inferred.

SSR 83-20, 1983 WL 31249 at *2, 3; see also Field v. Shalala, CV-93-289-B (D.N.H. August 30, 1994)(reversing decision where ALJ failed to follow substantive requirements of SSR 83-20, including failure to consult medical advisor in face of ambiguous medical evidence).

If, on remand, the ALJ determines that Timmons is disabled within the meaning of the Act, the ALJ must necessarily determine the onset date of Timmons' disability and whether or not that date preceded his last date of insured status.  Based upon the record before me and the possibility that no further medical records will be forthcoming, it appears that the ALJ should enlist the services of a medical consultant to help make that determination.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge


August 17, 1999

cc:  Jonathan Baird, Esq.
     David Broderick, Esq.